```
                  UNITED STATES DISTRICT COURT
                   MIDDLE DISTRICT OF TENNESSEE
                        COLUMBIA DIVISION
```

SHERRY T. KING              ]
                            ]
v.                          ]      No. 1:02-0033
                            ]      Judge Higgins
UCAR CARBON COMPANY, INC.,  ]
et al.                      ]


M E M O R A N D U M


The Court has before it the motion (filed March 12, 2004; Docket Entry No. 42) by defendant UCAR Carbon Company, Inc. for judgment in its favor on the administrative record, and the memorandum (filed March 15, 2004; Docket Entry No. 43) filed by defendants Phoenix American Life Insurance Company and GE Group Life Assurance Company ("GEGLAC") setting forth their arguments for judgment in their favor on the administrative record. The plaintiff has filed no response or objection.[1]

The Court has subject matter jurisdiction over the plaintiff's claim under the Employee Retirement Income Security Act, 29 U.S.C. § 1132(e).

For the reasons set forth below, the Court shall affirm the findings of the administrator.

I. FACTS

The plaintiff, Sherry T. King, was employed by UCAR Carbon Company as a plant laborer performing janitorial services and was

---

[1] See order (Docket Entry No. 44) entered April 15, 2004.

covered by UCAR's employee benefit plan. The plan included both long term disability coverage and a total and permanent disability pension. The plan provides that long term disability benefits will not be paid during the elimination period. See notice (filed June 14, 2005; Docket Entry No. 46) of filing Exhibit A at 18. The "elimination period" is defined as "The number of consecutive days of a Period of Disability . . . which must be completed before [the plan] will pay [the participant] the Monthly Benefit. No benefits will be paid to [the participant] for any portion of [her] Period Of Disability that occurs during the Elimination Period." Id. at 5. The elimination period is the later of: "The date non-occupational and occupational disability pay benefits or salary continuation plan benefits end, or 180 days per Period of Disability." Id. at 3. Further, to satisfy the definition of "total disability" a participant under the long term disability plan must be unable to perform all material and substantial duties of his or her regular occupation during the elimination period and the following 24 months. Id. at 9. Beyond 24 months, a participant must be "unable to perform the duties of Any Occupation" for which she is reasonably qualified for by education, training or experience. Id. at 9, 4.

Moreover, the plan limits coverage of any disability caused or contributed to by mental illness to 24 months. The plan defines the term "mental illness" as follows:

2

1. Means any Sickness, disease or disorder, including those which are the result in any way of a genetic, chemical, organic or biologic cause, which:

   a) is medically classified or considered, whether in whole or in part, to be a psychological, behavioral or emotional condition; or

   b) is manifested by psychological distress or impaired social functioning, or both; or

   c) is treated by or deal with, in whole or in part, through psychotherapeutic or sociotherapeutic methods or by medication which is intended to alter or affect emotions, behavior or thought content.

2. Includes but is not limited to:

   a) anxiety, panic, and somatoform disorders;
   b) mood disorders, including depression and bipolar disorder (manic depression);
   c) dissociative disorders and schizophrenia;
   d) personality and eating disorders; and
   e) any Sickness, disease or disorder which a reasonable person would commonly consider to be a mental or emotional disease or disorder.

Id. at 6.

On or about August 13, 1997, Ms. King suffered a myocardial infarction and was hospitalized for surgical implantation of stents, followed the next month by implantation of a pacemaker to treat ventricular tachycardia. (AR 261, 274). In an undated statement in support of a claim for short term disability, Dr. Joseph Fredi indicated that the plaintiff was expected to be able to return to work in one to three months. (AR 0171).

On September 18, 1997, Dr. Fredi wrote that the plaintiff should refrain from any kind of stressful activities for a period of time to be determined based on her clinical course and outcome.

(AR 0439). On a form submitted on November 20, 1997, in connection with the plaintiff's claim for disability benefits, Dr. Fredi indicated that her condition was improved, that she could occasionally lift up to 26-50 pounds and occasionally carry up to 11-25 pounds, that a psychiatric impairment restricted her to limited stress situations and limited interpersonal relations, and that she was not totally disabled. (AR 0564). On January 14, 1998,[2] Dr. Fredi indicated that the plaintiff had undergone complete evaluation and treatment and could return to work with no restrictions. (AR 0531). On February 5, 1998, Dr. Walter Clair, a cardiologist who had been treating the plaintiff for her arrhythmia, reported that the only restriction arising from her pacemaker was to avoid electromagnetic fields. (AR 530). Based on reports from Dr. Fredi and Dr. Clair, Phoenix found the plaintiff ineligible for long term disability benefits in a decision issued February 12, 1998. (AR 0522-23).

In a letter dated March 12, 1998, Dr. Clair explained that although the plaintiff was physically capable of working, he was concerned that exposure to electromagnetic interference at her work site might deactivate her pacemaker and render it ineffective. (AR 515). On June 12, 1998, Dr. Fredi relayed that because of her cardiac problems and pacemaker, the plaintiff felt incapable of

---

[2] It appears clear from the context that the date "January 14, 1997" on Dr. Fredi's memorandum is a typographical error.

doing heavy exertional work, and that many patients with pacemakers are incapable of such work. (AR 470). He followed up with a functional capacity worksheet on October 19, 1998, on which he indicated that the plaintiff could not do any lifting or carrying or spend more than two hours per day on her feet, that she could not be around hazardous machinery or electrical hazards, and concluded that she could not work "at all at any time." (AR 0393-94).

On December 23, 1998, Phoenix reconsidered its decision and approved the plaintiff's claim for long term disability benefits. (AR 0390). However, because a vocational rehabilitation specialist had identified multiple occupations within the national economy that the plaintiff could safely perform, Phoenix denied her claim for total and permanent disability pension. (AR 0392). The plaintiff appealed the denial of total and permanent disability benefits, and Phoenix denied the appeal in a detailed letter dated February 11, 1999. (AR 0290-91).

In March 2000, Phoenix notified the plaintiff that her 24 month period of long term disability would be expiring on July 4, 2000, and that it was conducting a review of her case in order to determine whether she would qualify for benefits beyond that point by virtue of being totally disabled from any occupation for which she was reasonably qualified. (AR 0284). Additional medical records received after that time detailed a hospitalization in

September 1998 for chest pain, leading to a diagnosis of atypical chest pain. (AR 0274-75). The following month, Dr. Fredi noted that the plaintiff's cardiovascular/cardiac condition was stable and doing quite well, but that she was having problems with her nerves and that she stated that her nerves were the problem. (AR 0271). On March 15, 1999, he reported that her cardiac exam was normal, her lungs were clear and she was stable, but that she had occasional chest discomfort for which she blamed her nerves. He wrote that "she is considered totally disabled." (AR 0270). She was admitted to the hospital on October 21, 1999, for chest discomfort and discharged the following day with a diagnosis of unstable angina, tobacco abuse and coronary artery disease. (AR 0264). On October 26, 1999, the plaintiff was again admitted to St. Thomas Hospital for chest pain and underwent a second stenting procedure, which was deemed a success, and she was released the following day. (AR 0266). Within a month, on November 22, 1999, her cardiac exam was normal and she reported feeling better with no further chest pain. (AR 0269).

By January 2000 Dr. Fredi indicated that the plaintiff was "really doing quite well" except for some fluid retention. (AR 0268). On April 16th of that year, he reported that the plaintiff had reached maximum medical improvement and that her cardiac condition effected a marked limitation in her functional capacity, that she could occasionally lift and carry up to 11-25 pounds, and

6

lift and carry less than that frequently. He also noted that she reported being unable to keep up with work requirements due to stress, and that she had moderate limitations for that reason. Without explanation, he restricted her activities as follows: sitting one hour at a time, total time on her feet one hour at a time, walking 30 minutes at a time, standing 30 minutes at a time, bending 30 seconds, squatting 15 seconds, stooping 30 seconds, and kneeling never. (AR 0234). On May 16, 2000, Dr. Jeffery Adams reported that because of pain in her knee and shoulder the plaintiff was being treated with Motrin and Lortab and was limited to lifting and carrying up to 11-25 pounds, and had slight stress-related limitations. (AR 0250).

On July 24, 2000, Phoenix notified the plaintiff that based on her medical records she remained totally disabled in accordance with the plan, and would continue to receive long term disability benefits beyond July 3, 2000. Specifically, she would receive such benefits until August 27, 2019, as long as she remained disabled according to the policy. (AR 0228). At the plaintiff's urging, the defendants continued to investigate her claim for permanent total disability benefits, for which she had previously been denied, and repeatedly attempted to elicit information from Dr. Fredi relevant to that claim without success. (AR 0148-49). Instead, Dr. Fredi provided the plaintiff with a letter dated December 7, 2000, in which he described her as "a very unfortunate

7

female" and opined that she has "severe heart disease" and is "totally disabled due to her poor LV function and her congestive heart failure." (AR 0088, 0148).

UCAR forwarded the plaintiff's file for review to Dr. Mitchell Collman, a cardiologist with Piedmont Cardiology in Chapel Hill, who concluded on April 15, 2001, that she was not totally disabled from any occupation. (AR 0143). To the contrary, he noted that the records showed she was asymptomatic for cardiac disease following her second stenting procedure, that there was no indication of myocardium at risk or of congestive heart failure, that she showed no signs of arrhythmia and that her pacemaker had never been employed. He found that although she did have some workplace restrictions, including avoiding electromagnetic interference, they did not preclude her from a number of jobs, including her previous work. (AR 0144). Dr. Collman subsequently performed an independent medical examination of the plaintiff and on July 18, 2001 reaffirmed his opinion that although there was a period of time during which she could not work, she was not permanently disabled by her condition in August 1997 or at present. He concluded that her cardiac condition would enable her to do light and sedentary work. (AR 0131-32).

In light of Dr. Collman's assessment of the plaintiff's medical history and current condition, GEGLAC, which by then had taken over administration of the plan, determined that in addition

8

to being ineligible for permanent total disability pension, the plaintiff was no longer eligible for long term disability benefits, and they so notified her on February 25, 2002. (AR 0110). The plaintiff brought suit against UCAR on April 12, 2002, (Complaint, Docket Entry No. 1), alleging wrongful termination of benefits under ERISA and failure to accommodate under the Americans with Disabilities Act, 42 U.S.C. §12101 *et seq.*[3] GEGLAC denied the plaintiff's appeal on January 31, 2003, relying in part on the allegation in her complaint that "[i]f she is not [totally disabled], she is certainly disabled to perform some job functions, but is otherwise able to perform any number of jobs for which she is qualified or reasonably could by [sic] qualified by reason of training, education of ability." (AR 0044).

II. STANDARD OF REVIEW FOR ERISA ACTIONS

The parties are in agreement that the Court is to review this record under the arbitrary and capricious standard. Where the benefit plan under consideration expressly provides the fiduciary or administrator with "discretionary authority to determine eligibility for benefits or to construe the term of the plan," application of the highly deferential arbitrary and capricious standard of review is appropriate. Firestone Tire and Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S.Ct. 948, 956-57, 103 L.Ed.2d 80,

---

[3] By order (Docket Entry No. 19) entered on June 10, 2003, the Court granted the plaintiff's motion to dismiss her ADA claim without prejudice.

9

95 (1989); Yeager v. Reliance Standard Life Ins. Co., 88 F.3d 376, 380 (6th Cir. 1996).

In reviewing an administrator's decision under these circumstances, the Court must determine "whether the decision was arbitrary, capricious, made in bad faith or otherwise contrary to law." Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988), cert. denied, 488 U.S. 826 (1988). If the decision of the administrator or fiduciary is "rational in light of the plan's provisions," the decision must be upheld. Id.

III. ANALYSIS

As stated previously, the arbitrary and capricious standard is highly deferential and requires that the administrator's decision be upheld as long as it is rational in light of the plan's provision, as well as reasonable with no abuse of discretion. Firestone, 489 U.S. at 115; Yeager, 88 F.3d at 380; Tavares v. Unum Corp., 17 F. Supp.2d 69, 75 (D.R.I. 1998). "Before concluding that a decision was arbitrary and capricious, a court must be confident that the decision maker overlooked something important or seriously erred in appreciating the significance of evidence." Wahlin v. Sears, Roebuck & Co., 78 F.3d 1232, 1235 (7th Cir. 1996) (quoting Patterson v. Caterpillar Inc., 70 F.3d 503, 505 (7th Cir. 1995)).

In terminating the plaintiff's long term disability benefits, GEGLAC relied on the available medical information and the assessment of Dr. Collman. As detailed above, Dr. Collman's

10

conclusions were based on his own examination of and interview with the plaintiff as well as the records of her treating physicians, and his conclusions about her cardiac condition are well supported by the record. Despite Dr. Fredi's dismal portrayal of the plaintiff's condition in his letter of December 7, 2000, and the unexplained physical limitations on his April 16, 2000 statement, his own records indicate that he had released her to work without restriction following her initial treatment, and that she was later doing quite well and was free of chest pain following her second procedure.

Generally, the opinion of a treating physician is accorded more weight than that of a non-treating physician. Marchetti v. Sun Life Assurance Co. of Canada, 30 F. Supp.2d 1001, 1009 (M.D. Tenn. 1998); Palmer v. University Med. Group, 994 F. Supp. 1221, 1234 (D. Or. 1998) (citing Lester v. Chater, 81 F.3d 821, 830-31 (9th Cir. 1995)). However, in this case the opinion is itself in conflict with the underlying records, as well as another physician's conclusion following a review of the records and an independent examination of the plaintiff. Based on Dr. Fredi's records, it appears at least possible if not likely that much of his opinion of the plaintiff's limitations are based on her reports of mental stress as opposed to her physical condition.[4] Under

---

[4]This likelihood is consistent with the fact that the plaintiff's award of social security disability coverage was apparently based largely on her mental health as opposed to her

these circumstances, the Court cannot conclude that a decision about the plaintiff's physical condition consistent with the underlying records and the opinion of an independent medical examiner constituted serious error or was otherwise arbitrary or capricious.

To the extent that the plaintiff claims that she is disabled due to pain in her shoulder, it is clear from the record that her shoulder injury occurred more than a year before her cardiac problems began,[5] and that her only work restriction related to her shoulder was to avoid overhead work with her left arm. (AR 0195-96, 0250, 0446-0452). Nothing about that limitation discredits Dr. Collman's conclusion that the plaintiff is capable of light and sedentary work with restrictions, or renders the administrator's agreement with that conclusion arbitrary or capricious.

---

physical health. In the decision awarding benefits, Administrative Law Judge Millard Biloon reported that "[t]he consulting physician opined that the claimant's chief complaint for seeking disability appeared to have less to do with her physical limitation as it does a mental one." He referred her for psychological evaluation, which led to diagnoses of panic disorder with agoraphobia and generalized anxiety disorder, and adjustment disorder with depression. (AR 0242-43). While these conditions, either alone or in conjunction with her physical limitations, may indeed render the plaintiff disabled for the purposes of Social Security benefits, psychiatric impairment does not qualify her for the benefits she seeks under this plan beyond the 24 month period for which she has already collected benefits.

[5] While the Court is unable to find evidence of the origin of the plaintiff's shoulder problem, it appears that an altercation with police on or before July 21, 1996, exacerbated a pre-existing condition, as her shoulder already had staples and screws at that time. (AR 0451).

12

IV.

Accordingly, the Court finds that the administrator's decision to terminate benefits in this case was supported by sufficient medical evidence and was neither arbitrary nor capricious in light of the applicable policy standards. Judgment shall be entered in favor of the defendants.

An appropriate order shall be entered.

_____
Thomas A. Higgins
United States District Judge
8-1-05